**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **E.G.-D., R.G.-D., B.G.-D., and A.R.**

**No. 21-1046** (Mingo County 21-JA-36, 21-JA-37, 21-JA-38, and 21-JA-39)

**MEMORANDUM DECISION**

Petitioner Maternal Grandmother S.G., by counsel Susan J. Van Zant, appeals the Circuit Court of Mingo County's December 3, 2021, order terminating her parental rights to the children.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Diana Carter Wiedel, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights and denying her post-termination visitation with the children.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In June of 2021, the DHHR filed a petition alleging that petitioner—the children's maternal grandmother—and the children's parents were involved in a domestic altercation in the home some months prior. According to the DHHR, petitioner was holding one-month-old A.R. when she and the father began arguing. The father punched petitioner while she was still holding the child then grabbed the infant from her. The father continued punching petitioner while holding the child, at which point all three of them fell to the ground, with the father landing on top of the infant. At this point, the mother intervened, grabbed the infant, and then began punching the father. When Child Protective Services ("CPS") investigated, they found that the children were without clothing and one child had been urinating into a toy. During the investigation, both parents admitted to domestic disputes in the children's presence. At that time, CPS instituted services in the home in order to

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

address the conditions. In April of 2021, CPS arrived at the home to find the children alone with petitioner, who struggled keeping them under control. Three of the children were covered in flour and running outside without clothes, despite the presence of a stranger. In May of 2021, both parents tested positive for drugs on multiple occasions, including amphetamine, methamphetamine, marijuana, ecstasy, and buprenorphine. Further, the DHHR discovered that the mother's parental rights to several older children were previously involuntarily terminated in Kentucky. According to the petition, petitioner submitted to a drug screen and passed. The petition was also clear that petitioner "was in a caretaker role in the home." Based on this conduct, the DHHR alleged that the children were in danger while in petitioner's custody.

In June of 2021, the court held a preliminary hearing, during which a DHHR worker testified to petitioner's caretaker role in the home and confirmed that petitioner failed to take any steps to protect the children from the issues therein. The worker testified to her opinion that if petitioner passed a drug screen during the hearing, it would be appropriate for her to retain custody of the children. However, counsel for the DHHR and the guardian both objected to petitioner's continued custody of the children on the basis that they believed she lived in the home with the parents and that, if she did not live there, then there was no information as to whether she had appropriate housing for the children. Further, petitioner refused to submit to the ordered drug screen. As such, the court ultimately ratified removal of the children from the home.

The following month, the court held an adjudicatory hearing, during which the court found that petitioner abused and neglected the children. During this hearing, the court also noted that at some point petitioner "was positive for Suboxone" and that she "may or may not have a prescription for it. We don't know." The court also ordered petitioner to submit to another drug screen.

According to court summaries filed in August and September of 2021, the DHHR asserted that it could not provide services because petitioner and the parents could not be reached. The DHHR indicated that petitioner and the parents "reported they have moved however a definite answer of how to reach them has not been provided." In October of 2021, the guardian filed a report in which she asserted that petitioner failed to participate in the proceedings, having failed to remain in touch with the DHHR or her counsel. The guardian also noted petitioner's prior refusal to participate in a drug screen. Accordingly, the guardian requested that "any custodial rights" of petitioner be terminated due to her failure to comply with the court's and the DHHR's requirements.

In September of 2021, the court held a dispositional hearing. Petitioner did not attend but was represented by counsel. The court continued this hearing to permit the parents time to complete a detoxification program. Thereafter, the court held continued dispositional hearings over several days. At what was intended to be the final dispositional hearing on November 10, 2021, petitioner expressed her willingness to screen, but the court decided it was unnecessary when petitioner indicated that she would test positive for marijuana. Petitioner also indicated that she attempted to go to rehab "last week or maybe this week," but could not because she had "so many health problems." A DHHR caseworker then testified to the recommendation that petitioner's rights be terminated due to her noncompliance with services and because the children would not be safe in her custody, contrary to their best interests. According to the worker, petitioner's only cooperation

came just one week prior to the hearing when she "came forward . . . trying to go to rehab." The worker explained that petitioner's application was rejected because of the various medical issues she listed. Further, the worker testified that just prior to the hearing, petitioner "appeared to be sleeping or passed out" in the hallway.

Petitioner then expressed a desire to testify, but concerns were raised about her being under the influence and how it would impact her competency. As such, petitioner was ordered to submit to a drug screen. However, the court noted after a recess that petitioner had been "sitting over there for . . . two hours, says she can't produce." Because of petitioner's past refusals to screen, the court "deem[ed] this a refusal." The court then asked petitioner's counsel where petitioner lived, and counsel responded, "that I do not know . . . I've been told that she's homeless." Ultimately, the court found that petitioner was unwilling or unable to correct the conditions of abuse and neglect that necessitated the children's removal and that there was no reasonable likelihood she would do so in the near future. The court also found that the children's need for permanency resulted in post-termination visitation with petitioner being against their best interests and denied the same. The court then terminated petitioner's parental rights to the children.

However, the court held a "supplemental hearing" one week later so that petitioner could testify. During this hearing, the court explained that petitioner eventually submitted to a drug screen at the November 10, 2021, hearing that was "positive in several areas," including for methamphetamine. Petitioner admitted to abusing marijuana but denied having abused methamphetamine, instead suggesting that the marijuana she abused was laced with it. Petitioner claimed to have a home in Kentucky, but no evidence was introduced to corroborate her testimony. Ultimately, the court again found that termination of petitioner's parental rights was appropriate and entered the dispositional order memorializing this ruling on December 3, 2021.[2] It is from this order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

_____

[2]The parents' rights were also terminated. The permanency plan for the children is adoption together in the current placement.

On appeal, petitioner argues that it was error to terminate her parental rights because she is not a parent to any of the children. Petitioner argues that "[a] grandparent[']s rights are not clearly set forth in West Virginia law aside from the consideration of a request for visitation" and that "[g]randparents['] rights are secondary to parental rights." The Legislature, however, has been explicit that parents are not the only individuals that may be subject to abuse and neglect proceedings. Pursuant to West Virginia Code § 49-4-601(b),

> [e]ach petition shall name as a party each parent, guardian, custodian, other person standing in loco parentis of or to the child allegedly neglected or abused and state with specificity whether each parent, guardian, custodian, or person standing in loco parentis is alleged to have abused or neglected the child.

This language makes it clear that the DHHR is required to include individuals *other* than parents in abuse and neglect proceedings. Here, the DHHR established not only that petitioner exercised custody over the children, but that she also, at a minimum, neglected them.

On appeal, petitioner argues that she does not meet the definition of any of the individuals contemplated by West Virginia Code § 49-4-601(b) by relying on testimony from a DHHR worker that the mother made petitioner leave the home, thereby demonstrating that she was "not the person in charge." However, she ignores the fact that the DHHR worker testified that petitioner was alone in the home with the children in a "caretaker role." Petitioner would have this Court excuse her neglect simply because she was not the "primary" caregiver, despite evidence demonstrating her custody and neglect of the children. We refuse to do so. Further, petitioner appears to argue that she was powerless to prevent the children's neglect because, legally, she could not interfere with the parent-child relationship. This argument ignores the reality that petitioner could have taken any number of steps to curb the parents' abusive and neglectful conduct, such as referring them to CPS, seeking legal guardianship of the children, or even filing her own abuse and neglect petition. *See* W. Va. Code § 49-4-601(a) (permitting a "reputable person" to present a petition setting forth allegations of abuse and neglect). Instead, petitioner subjected the children to neglect while exercising custody of them.

The only issue this Court can identify with the termination of petitioner's parental rights is a clerical error. Petitioner is correct that she did not possess any "parental" rights that could be terminated, but this does not mean that the court's termination of her rights was an error that requires vacation. Instead, we note that West Virginia Code § 49-4-604(c)(6) permits not only the termination of parental rights, but also custodial rights. Read in conjunction with West Virginia Code § 49-4-601(b), as quoted above, it is clear that this statute permits the termination of rights possessed by individuals *other* than parents. Accordingly, we agree with petitioner that the circuit court erred in terminating petitioner's *parental* rights, as she was not possessed of the same, but conclude that this clerical error in using the incorrect statutory language is of no impact on petitioner's appeal. Instead, we find that the order clearly terminated the rights petitioner did possess, being her custodial rights to the children. Indeed, this Court has upheld termination of rights where "[t]he dispositional order entered by the circuit court . . . [does] not track the language of West Virginia Code [§ 49-4-604]" when the Court was convinced, after reading the dispositional hearing transcript, that "the trial court first reached the conclusions required by [West Virginia

4

Code § 49-4-604(c)(6)] before terminating" the rights. *In re Jamie Nicole H.*, 205 W. Va. 176, 184, 517 S.E.2d 41, 49 (1999) (addressing the sufficiency of the dispositional order sua sponte). Accordingly, petitioner is entitled to no relief. Having resolved petitioner's argument that the court could not terminate rights that she did not possess, we further conclude that the ultimate termination of petitioner's custodial rights was appropriate, as the court made the findings required for such termination. *See* W. Va. Code § 49-4-604(c)(6) (permitting the termination of custodial rights "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child").

Finally, petitioner asserts, in passing, that she had a strong bond with the children such that continued visitation with them was appropriate. We have explained that post-termination visitation can be appropriate when "[t]he evidence . . . indicate[s] that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest." Syl. Pt. 11, in part, *In re Daniel D.*, 211 W. Va. 79, 562 S.E.2d 147 (2002) (citation omitted). In denying petitioner's request, the court specifically found that continued visitation with the children would threaten their permanency, thereby undermining the children's best interests. Accordingly, we find no error in the court's denial of post-termination visitation with petitioner, especially considering her almost total refusal to participate in the proceedings.

For the foregoing reasons, the court's December 3, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: August 31, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn

5